R. H. HYDE V. THE STATE.

No. 20613.   Delivered January 10, 1940.
Rehearing Denied February 21, 1940.

458

The opinion states the case.

*Gordon M. Burns* and *M. E. Gates,* both of Huntsville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of the unlawful killing of Charlie Goodson, and sentenced to be imprisoned in the state penitentiary for life.

The facts adduced by the State show that appellant was a prison guard, and at the time of the killing he was hunting for an escaped convict. Appellant, together with another guard, had spent the better portion of the day traveling from point to point, endeavoring to find this escaped convict. They had consumed together more than a quart of whisky, contrary to the rules of the prison board, and gave evidence of intoxication to some degree. The appellant and his comrade had been present in the deceased's barbershop during the afternoon, and appellant told of his having captured another escaped convict, and related the circumstances relative thereto to one Eric Isgate. In such conversation he told that when he first accosted such convict he did not know who he was, but said that if such person had attempted flight he would have shot him. Then turning to Isgate he said: "You would have done the same thing, wouldn't you?" to which the witness Isgate answered "No, I don't think I would."

Sometime thereafter the two guards, desiring more whisky, went to the house of one Jug Weaver for the purpose of purchasing whisky and drove around to the rear of said Weaver's house. Just prior to such time, however, the witness Isgate and deceased Charlie Goodson had closed up the Goodson barbershop, and Mr. Isgate was taking Mr. Goodson home in his car. Mr. Goodson was suffering with a cold and requested Isgate to drive by this same Jug Weaver's house for a few moments. They had arrived at this house and Mr. Goodson had gone into Weaver's home at the time the two convict guards drove up. Isgate, while sitting in his car, was approached by the appellant who jerked the car door open, threw his gun on witness and said "Get out, you convict-loving son-of-a-bitch; I am going to kill you." Witness got out with both of his hands up and walked backward from the appellant, and appellant told him to get on in the house, punching him with his gun. About that time the deceased Charlie Goodson came from around the house, and witness heard him say "Don't do that; don't do that," at which time the pistol fired one shot which took the life of Mr. Goodson. It also appears that Mr. Goodson had nothing in his hands and had no weapon on his body at the time he was killed.

Appellant's only defense was that he knew nothing about what happened he was so drunk; that he did not remember any

of the occurrences relative to the killing, and had no idea of killing anyone; that he did not know Mr. Goodson.

Appellant's first bill of exceptions complains of the court allowing the State to prove by the witness Isgate a statement relative to the capture of a convict on the day before the killing in which the witness stated that appellant said if the person captured the day before had run he would have shot him. It was necessary that the State find some motive, if possible, for this wanton killing, and it seems to have probably been based upon the fact that the witness Isgate had angered the appellant in Goodson's barbershop by making the statement that he would not have killed the convict who was captured had this convict tried to escape from him.

Following up the question objected to in bill No. 1, the court also permitted the witness Isgate to state, as shown in bill of exceptions No. 2, that when witness said he would not have shot the convict had he tried to escape, the defendant said "Ah, Hell I would." In all probability the motive for this killing, as shown by the statement made by appellant at the scene of the killing, was based upon the conversation in which Mr. Isgate said that he would not have killed the escaping convict. The appellant's mind was doubtless so enraged that when he saw Isgate at Jug Weaver's home he called him "a convict-loving son-of-a-bitch," and threatened his life, and doubtless might have intended to kill Isgate at the time he killed Charlie Goodson as they were both at the same house and on the same mission and he may have been confused as to their identity. These bills are overruled.

Bill of exceptions No. 3, in our judgment, reflects no error, no answer having been elicited from the witness.

Bill of exceptions No. 6 is in question and answer form, and we find no certificate of the trial judge that it was necessary for such to be thus presented. We therefore can not consider the same.

Bill of exceptions No. 7 has been considered by us, and we can see no error reflected therein. It complains of the fact that prior to the time of the signing of the criminal minutes of the court the district clerk, under the direction of the court, entered the name of the defendant in cause No. 6414, which is the number of the instant cause in the lower court. The court merely made the record speak the truth, and surely has control of his minutes up to the time same were signed and the term of court adjourns.

It is also complained by appellant that the witness Marshall Bynum was not a qualified juror in that he was not a householder in the county nor a freeholder in the State. We have carefully gone over the testimony relative to this matter, and, in our judgment, the juror was the head of a household, consisting of himself, his mother and a younger brother, and was a qualified juror under the law.

Appellant also filed a motion for a change of venue in this cause, alleging therein that "there is a dangerous combination existing by influential persons by reason whereof he can not expect a fair trial in Cherokee County," and that a jury of unbiased and unprejudiced men to try said cause could not be had in such county.

The court heard testimony relative to the matter, and witnesses testified both pro and con at such time.

It seems that the trial court was not in accord with the allegations in the motion for change of venue, and we see no reason to disturb its findings therein. Unfortunately for the defendant, he was not well known in Cherokee County, and again unfortunately he seems to have killed a man who had friends in such county and who was rather prominently connected therein. In our opinion the record shows that there were enough qualified and unbiased jurors in this case presented to him to assure him a fair and impartial trial under the circumstances. We see no error reflected herein.

This was a killing based upon a drunken carousal, with neither justification nor excuse in taking the life of a man who was unarmed and making no attack of any kind upon the appellant. The only defense that appellant offered was intoxication at the time, his testimony showing that he remembered nothing of the transaction that took this man's life, and the court gave a comprehensive charge on temporary insanity produced by the voluntary recent use of intoxicating liquor, but limited same, as in law he was bound to do, to be considered by the jury only in mitigation of the penalty, if they so desired. We find the charge to be admirably drawn, and possibly more favorable to appellant than he was entitled to, and under the circumstances presented to us we find no error shown in this record.

This judgment is therefore affirmed.

ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

On his motion for rehearing appellant insists that the

court erred in not sustaining the bills of exception complaining of the testimony of Eric Isgate. A little more definite discussion of this testimony should suffice to make the court's position clear on this subject, and we think the original conclusion was correct. The appellant was a guard for the penitentiary System on one of its farms. On the particular occasion of the tragedy, he was in Cherokee County in search of an escaped convict. He was accompanied by another guard who apparently had not known him for any great length of time. The two had purchased and drunk two pints of liquor, and at the time of the tragedy were trying to buy more. For this purpose they had gone to the home of Jug Weaver from whom they thought they could buy some more liquor. It was at his home that the tragedy occurred. Prior to that and during the same day, the appellant had met up with the witness, Eric Isgate, in a barber shop and at said time engaged in a conversation in his presence about a man he had apprehended as a prisoner, and made the remark that when he asked the fellow to stop he would have shot him if he did not stop whether he knew he was a convict or not. The crowd in the shop apparently did not agree with this conduct, and the appellant turned to the witness and asked if he would not have done the same thing, to which the witness replied in the negative. The witness testified on re-direct examination concerning this conversation that when he made this negative reply to the appellant in the barber shop he (appellant) got up and moved like he did not like it much and that he appeared very angry at the witness. As the appellant and his companion approached the home of Jug Weaver, the witness Isgate was in his car near the house and with the engine running, while the deceased, Charlie Goodson, who had come to the place with Isgate, had gone into the house, entering by the back door. When the appellant approached he recognized Isgate and said to him, "Get out of that car, you convict-loving son-of-a-bitch; I'm going to kill you." The witness pleaded with him but the appellant demanded that he get out and go into the house. He punched the witness with a pistol and still insisted that he go in. As he entered the house the appellant, who was in a drunken condition, saw the deceased, Charlie Goodson, come around the corner and in just a few feet of the witness who was entering the house. It was the State's theory which appears to be reasonable, that the appellant mistook Goodson for the witness Isgate and probably thought that he had turned around and was coming back toward him. He fired the shot that killed Charlie Goodson immediately. The appellant did not know Goodson and had no

dealings with him, and the State's theory that he thought it was Isgate is reasonable. This being true, the transaction earlier in the day at which he became angry with the witness and which he recalled at that particular time is pertinent. If he had killed Isgate there could be no doubt of its admissibility. Inasmuch as he killed Goodson at the very time while he was driving Isgate into the house and probably under the mistaken idea of a drunk man that he was shooting at Isgate, it is likewise clear that the detail of the earlier transaction was admissible in explanation of the motive for his conduct at this particular time.

Appellant's counsel ably briefed the question, but did so on the theory that the testimony as to what transpired in the barber shop was another distinct and separate offense. It was not an offense against the law but merely an incident which is connected up by the appellant's language with the things that happened at the very time of the killing. There being no motive for the killing of Goodson by the appellant, the question of his intention became a matter of importance, and the evidence complained of is certainly appropriate to make that explanation.

Appellant discusses the case of Woodward v. State, 51 S. W. 1122. We note that the court, in discussing the testimony held to be inadmissible, considered it as a transaction between the appellant and another entirely different person. In the instant case, Isgate was materially involved. The appearance of Goodson probably saved the life of Isgate. In the Woodward case the reason of the court for its decision was that "there was no attempt to connect these matters so as to make the testimony admissible." The connection that was made of the testimony certainly gives it quite a different standing in the instant case.

Hill v. State, 73 S. W. 9, was a burglary case. The court permitted the prosecution to prove another burglary on the same night by the same defendant. It was held in that case that inasmuch as the other burglary had no connection with the one for which Hill was being tried and that it threw no light on the charge that he broke into the Tillman store, that it was an isolated transaction and as such was inadmissible in the case for which he was being tried. We adhere to the doctrine in that case, but it is not applicable here.

Pace v. State, 124 S. W. 949, is likewise of a different nature. The defendant on trial had met a witness at a certain

place and told him that he had come there to "raise hell." The court held that it was not admissible to introduce testimony of an extraneous crime except that it should come within some of the exceptions to the rule, as for the purpose of showing intent, system, identity of the parties, etc. No connection was shown between the statements made at that time and the crime which the appellant actually committed, there being no question as to intent.

Lawrence v. State, 82 S. W. (2d) 647, approved the ruling in the foregoing cases and restated the general principle often expressed that evidence of distinct and separate offenses is inadmissible except under the stated exceptions. No isolated case is ever admissible for the purpose of showing that the defendant is a criminal generally, but there is nothing in the Lawrence case helpful to the appellant's contention here.

Appellant insists that there is no evidence offered in any way connecting him with the transaction or the occurrence about which Isgate testified with the death of Goodson. We think that the appellant very forcefully connected the two conversations when he approached Isgate, calling him a "convict-loving son-of-a-bitch." He had special reference to the transaction involving the evidence complained of.

The question herein treated gave this court considerable concern when the case was originally presented. We have again reviewed the evidence and the authorities on this question, together with each and every other question raised by the motion for rehearing, and have come to the conclusion that they were correctly disposed of in the original opinion.

The motion for rehearing is overruled.